United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   HI QUOC TRUONG,                          No. C 06-4235 MMC

12          Plaintiff,                         **ORDER DENYING AMENDED PETITION
                                               FOR WRIT OF HABEAS CORPUS**
13      v.

14   D.L. RUNNELS, in his capacity as Warden
     of the High Desert Prison,
15
            Defendant.
16   _____/

17

18          Before the Court is petitioner Hi Quoc Truong's ("Truong") Amended Petition for Writ

19   of Habeas Corpus ("petition"), pursuant to 28 U.S.C. § 2254.  Respondent D.L. Runnels

20   ("respondent") has filed an answer, to which Truong has replied by filing a traverse.  Having

21   considered the papers filed in support of and in opposition to the petition, the Court rules as

22   follows.

23                              **PROCEDURAL BACKGROUND**

24          In 2002, a jury in the Superior Court of the State of California, in and for the City and

25   County of San Francisco, found Truong guilty of first degree murder and attempted murder,

26   and further found Truong had personally used a firearm in the commission of the murder.

27   (See RT 2082.)[1]  Lung Lam ("Lam") was killed in the shooting, and his friend Van Viet Ho

28
     _____
            [1] The transcript of the trial ("RT") cited herein was filed by respondent on June 23,
     2008 as Exhibit 5 to the Answer.

1   ("Ho") was shot, but survived.  Truong was sentenced to a total prison term of 25 years to

2   life.  (See Pet. Ex. L (People v. Truong, 2005 WL 11776 (Cal. Ct. App. Jan. 3, 2005) at *4.)

3       The California Court of Appeal affirmed Truong's conviction in an unpublished

4   opinion, see id. at *10, and the California Supreme Court denied review (see Ans. Ex. 4).

5   Truong subsequently filed a petition for a writ of habeas corpus in the Superior Court, which

6   petition was denied in a reasoned opinion.  (See Pet. Ex. B (In re Truong, No. 5378 (Oct. 6,

7   2006).)  Truong thereafter filed habeas petitions in the California Court of Appeal and

8   California Supreme Court, which petitions were summarily denied.

9                                **FACTUAL BACKGROUND**

10      The following facts are taken from the Court of Appeal's January 3, 2005 decision:

11  Prosecution Case

12          Van Viet Ho was 27 years old and a native of Vietnam.  He had lived in
    the United States for nine years.  On the night of June 20, 1999, Ho went to a
13  bar in San Francisco's Tenderloin District called the New Short Stop with two
    friends, Trung and Lung Lam.  Ho and his friends drank beer at the bar.  As Ho
14  walked toward the men's restroom, he was tapped on the shoulder from behind
    and he heard someone say, "You look so streetwise."[2]  Ho turned around and
    was struck in the face by a man he later identified as defendant.

15          A group of men rushed into the bar and one man pushed Ho with a
    barstool.  A shot rang out and everyone ran.  Ho sat down and saw his friend
16  Lung Lam lying on the ground with blood covering his shirt.  Defendant, standing
    over Lam, pointed a gun at Lam and fired two or three shots before he turned
17  and ran.  Ho did not notice if defendant ran out of the bar.  He was three or four
    feet away when he saw defendant shoot Lam, who was unarmed.  Ho crawled
18  over to his friend and began CPR on him.  He told the bar owner to call an
    ambulance.  At that moment, Ho saw two policemen enter the bar.

19          At about 1:30 a.m. on June 21, 1999, Officer Bobby Cheung and his
    partner, Officer Tim Fowlie, were dispatched to 755 O'Farrell Street to
20  investigate a noise complaint.  They were getting out of their police car when
    they heard a gunshot, followed by two more gunshots.  The shots appeared to
21  come from the New Short Stop bar across the street at 782 O'Farrell, where
    several Asian males were running out.  One of them yelled at the officers that
22  someone had been shot in the bar.  Officer Cheung did not see anyone fleeing
    with a gun.  Officer Fowlie radioed dispatch and other units about the situation
23  and then proceeded quickly toward the bar.

            Officer Cheung entered the New Short Stop with his gun drawn.  He saw
24  an Asian male, later identified as defendant, holding a black semiautomatic
    handgun in his right hand close to his leg.  Officer Cheung pointed his gun at
25  defendant and ordered him out of the bar.  As Officer Cheung was escorting
    defendant out, Officer Fowlie saw a black semiautomatic handgun on a red
26  barstool that had been directly behind defendant.  Officer Fowlie retrieved the

27  _____

28      [2] The interpreter explained that the word Ho used in his testimony, "lauca," has other
    possible meanings, including "tough," and "tricky."

                                        2

gun, which was loaded and cocked.  It was later found to contain four bullets inside.  The gun's magazine could hold seven rounds.  Three bullet casings were found in the bar.

Outside on the sidewalk, Officer Cheung quickly searched defendant for weapons and found none.  Backup units began arriving.  There were still about 10 people in the bar and Officers Cheung and Fowlie ordered everyone to get on the ground.  In the rear, Ho was administering CPR to Lung.

When paramedics arrived, Ho realized that he had been shot.  He was taken to the hospital where he spent 12 hours before being discharged.  Inspector Thomas Walsh and another officer went to the hospital twice and spoke to Ho.  On the second visit, Ho was shown a photographic lineup.  Ho identified defendant's picture as the man who had tapped his shoulder and shot his friend.  At trial, Ho showed the jury two scars in his abdomen, just to either side of his belly button, that were the results of being shot.  Ho was impeached with evidence that he pleaded guilty in 1998 to willfully eluding a pursuing officer's vehicle, a misdemeanor.

Lam died from multiple gunshot wounds.  He was shot in his left chest and right flank.  He also had superficial blunt force injuries to his face.  Test-fired bullets from the gun retrieved from the barstool at the New Short Stop matched bullets found at the crime scene, although the amount of matching detail was weak.  A bullet removed from Lam during autopsy had insufficient detail to establish with certainty that it was fired by the same gun, but it had enough detail matching the test-fired bullets to establish that it probably came from the same gun.

The gun was tested for fingerprints but no prints could be obtained.  Usable fingerprints can be successfully lifted from a weapon in only five or six percent of the cases.  The gun's serial number had been removed.  A gunshot residue sample was collected from defendant's hands on June 21, 1999, at 3:30 a.m.  Gunshot residue was found on both of defendant's hands, which indicated that defendant had discharged a weapon or his hands had been in an environment of gunshot residue.  Gunshot residue was also found on both hands of the victim, Lam.  There can be gunshot residue within two and a half feet of the discharge of a firearm.

About five or six hours after the incident, Inspector Walsh interviewed the New Short Stop's bartender, Ann Tran, at the police station.  She did not appear intoxicated, she was offered food or drink, and she had a cup of coffee.  Ms. Tran identified a picture of defendant and said she had seen him four times before that night.  She described him as a regular customer and called him Eric.  Ms. Tran demonstrated how Lam was shot; she extended her arm and pointed her hand, shaped like a gun, toward the ground and she said, "Shoot, shoot, shoot, shoot, shoot."  Ms. Tran said she was scared.  She said, "I don't want nothing to happen to me."

As trial approached, Ms. Tran was not cooperative with the prosecution.  Inspector Walsh made numerous unsuccessful attempts during all hours of the day before he was able to serve her with a subpoena.  At trial, Ms. Tran testified that on the night of the incident, she had been drinking with the customers and was in the women's restroom vomiting when she heard a gunshot.  She was scared.  When she came out of the restroom, she saw a man pointing a gun at another man on the ground.  She told the man with the gun, "Stop, stop."  However, Ms. Tran repeatedly testified that she was drunk that night, did not see who was holding the gun, did not see the gun being fired, did not remember a regular customer named Eric, and had no recollection of other details.  She claimed she lied during her police interview because she was tired and drunk, the bar owner's daughter told her what to say, she was pressured with a lot of questions, and she just wanted to be done with the interview.

3

A videotape of Ms. Tran's police interview was played for her outside the jury's presence to refresh her memory. Afterwards, in front of the jury, Ms. Tran continued to insist that she was drunk and exhausted during the interview and that she had no recollection of the interview or of the events of that evening. She acknowledged that on the videotape she identified defendant as the person holding the gun, that she had seen defendant four times in the bar before, and that she knew him by the name Eric. Ms. Tran told the jury that the police kept showing her defendant's photograph and asking her to identify him as the shooter until she decided to say "yes" just to get the interview over with. She also testified that what she told the police was what the daughter of the bar owner had told her before the interview. The jury saw the videotape of Ms. Tran's police interview.

Defense Case

Chryse Hawes, who worked for the emergency communications department of the police and fire departments, explained how to read the computer-assisted dispatch (CAD) printout showing communications between officers and dispatcher during the incident. As the CAD tape was played for the jury, Ms. Hawes explained the meaning of the various codes used on the tape. At one point, a voice is heard on the tape saying the "221" is in custody and the suspect is "GOA." Ms. Hawes explained that "221" means "person with a gun" and "GOA" means "gone on arrival."

Haroon Anwar, a surgeon who saw Mr. Ho when he was brought into surgery on June 21, 1999, testified that a diagnostic peritoneal lavage was performed on Ho under local anesthesia. He had four superficial abdominal wounds apparently caused by two gunshots. The abdominal wounds appeared to be superficial, showing tracking in the fatty tissue just underneath the skin, without causing any internal injury or entering into the abdominal cavity.

Dr. Boyd Stephens, chief medical examiner for San Francisco, testified about the effects of alcohol on the human body. He tested a blood sample taken from Lung Lam during the autopsy that showed an alcohol level of 0.16 percent. Defendant's blood alcohol level from a sample taken at 4:15 a.m. on June 21, 1999, was 0.05 percent, and his urine sample was 0.1 percent. The parties stipulated that blood taken from Mr. Ho at 2:07 a.m. on June 21, 1999, showed an alcohol level of 0.16 percent. Dr. Stephens testified that, hypothetically, a 155-pound individual with a 0.16 percent blood alcohol reading at 3:00 a.m., would have had a blood alcohol level between 0.18 and 0.20 at 1:00 a.m. This would have been the equivalent of about nine beers. Increased alcohol consumption causes a loss of peripheral vision and memory impairment.

In closing argument, defense counsel argued that the real shooter was gone when Officers Cheung and Fowlie arrived on the scene, and that the voice on the CAD tape saying the suspect was "GOA" was either Officer Fowlie or another officer who was relying on information provided by Officer Fowlie or Officer Cheung.

(Pet. Ex. B at *4-6.)

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

4

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  See Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  See Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

The decision implicated by § 2254(d) is the "last reasoned decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  As to the claims for which there is no reasoned opinion available, the United States Supreme Court has recently clarified that a federal habeas court, in applying the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state court, and that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770,

1    784-85 (2011).

2    **DISCUSSION**

3        Truong raises four claims in his petition: (1) ineffective assistance by trial counsel in

4    failing to perform an adequate investigation and, consequently, neglecting to put on a

5    viable defense; (2) failure by the prosecution to disclose exculpatory evidence;

6    (3) prosecutorial misconduct in the state's closing argument; and (4) cumulative error.

7        **A.**      **Ineffective Assistance of Counsel**[3]

8        A claim of ineffective assistance of counsel is cognizable as a denial of the Sixth

9    Amendment right to counsel, which guarantees not only assistance, but effective

10    assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to

11    prevail on a Sixth Amendment claim based on ineffectiveness of counsel, Truong must

12    establish two elements.  First, he must establish his counsel's performance was deficient,

13    i.e., that it fell below an "objective standard of reasonableness" under "prevailing

14    professional norms."  Id. at 687-88.  Second, he must establish he was prejudiced by

15    counsel's deficient performance, i.e., that "there is a reasonable probability that, but for

16    counsel's unprofessional errors, the result of the proceeding would have been different";

17    "[a] reasonable probability is a probability sufficient to undermine confidence in the

18    outcome."  Id. at 694.

19        Under Strickland's "highly deferential" standard, a court considering a claim of

20    ineffective assistance "must apply a strong presumption that counsel's representation was

21    within the wide range of reasonable professional assistance."  Harrington, 131 S. Ct. at

22    787-88. (internal quotations and citations omitted).  Further, where, as here, § 2254(d)

23    applies, a petitioner's burden is even greater. "The question is not whether counsel's

24    actions were reasonable.  The question is whether there is any reasonable argument that

25    counsel satisfied Strickland's deferential standard."  Id. at 788.

26

27        [3] The Superior Court's decision denying Truong's state habeas petition is the last

28    reasoned decision to examine the ineffective assistance claim.  (See Pet. Ex. B (In Re: Truong).)

1     Truong alleges his trial counsel, Rebecca Young ("Young")[4], provided ineffective

2   assistance.  Specifically, Truong asserts Young was ineffective in failing to (1) adequately

3   investigate a critical piece of evidence, (2) introduce testimony supporting an alternative

4   defense theory, (3) obtain expert testimony to challenge the government's physical

5   evidence regarding the manner in which Lam was shot, and (4) interview an eyewitness.

6                    **1.  Investigation of "Gone on Arrival" Call**

7     As set forth above, Truong's defense was that he was in no manner involved in the

8   shooting.  In her declaration submitted in support of the petition, Young states she made a

9   strategic decision to present an "innocence defense" based upon her mistaken belief that

10  Officer Fowlie sent out a radio transmission on the night of the shooting, reporting that the

11  shooter was "gone on arrival" when he and Officer Cheung arrived on the scene.  (See Pet.

12  Ex. G ¶ 6.)   Truong claims Young was ineffective in not learning earlier that the call had not

13  in fact been made by Officer Fowlie.

14    The state court denied relief on this claim, finding counsel reasonably relied on the

15  police dispatch tape to accurately reflect the identity of the "gone on arrival" caller, and

16  further, that it was not unreasonable for trial counsel to choose to impeach Officer Fowlie

17  with the CAD dispatch tapes "in front of the jury, rather than at an earlier proceeding."  (See

18  Pet. Ex. B at 5.)[5] As set forth below, the Court finds Truong has not shown he is entitled to

19  relief, for the reason that Truong fails to demonstrate Young's reliance on the dispatch tape

20  constituted deficient performance.

21    "[C]ounsel has a duty to make reasonable investigations or to make a reasonable

22  decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.

23  "In any ineffectiveness case, a particular decision not to investigate must be directly

24  assessed for reasonableness in all the circumstances, applying a heavy measure of

25

26        [4] Truong was also represented by attorney Luis Romero.  Romero submitted no
    declaration in support of the petition, and Young states the strategic decisions questioned
27  by the petition were hers to make.  (See Pet. Ex. G.)

28        [5] The Superior Court further found Truong failed to show counsel's reliance on the
    dispatch tape, even if unjustified, was prejudicial.  (See id. at 5-6.)

deference to counsel's judgments."  Id.  The fact that Young's assumption about the identity

of the caller turned out to be incorrect, in the end, is not itself sufficient to establish deficient

performance.  Rather, "[a] fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time."  Id. at 689.

Here, Young's investigation included a review of both the dispatch tape and a log of

the dispatch communications, both of which reflected the "gone on arrival" call was made

by an officer who identified himself with the unit call sign of Officers Cheung and Fowlie.

(See RT 1326.)  Additionally, the two items of evidence were not merely consistent but

were corroborative of each other, as the log was not a transcript of the tape, but, rather, an

independent summary of communications recorded by a dispatcher in real time.  (See RT

1336.)  Further, Young interviewed the custodian of records a year before trial to confirm

the unit designation was in fact assigned to Officers Cheung and Fowlie.  (See RT 1334).

Lastly, although the call sign applied to both officers, Young reasonably understood the

caller to be Officer Fowlie because the recorded voice was "clearly a Caucasian male,"

whereas Officer Cheung "has a thick Chinese accent."  (See RT 1335.)

Truong argues tactical decisions cannot be accorded deference if they are based on

a mistaken understanding.  The cases on which Truong relies, however, are

distinguishable, as the mistaken belief in each of those cases was readily correctable by a

cursory investigation of the relevant law or facts.  See, e.g., Williams, 529 U.S. at 395-96

(finding ineffective assistance in death penalty case, where trial counsel's decision not to

investigate or present mitigating evidence of defendant's abusive childhood was based on

unreasonable misunderstanding that state law barred access to childhood records);

Kimmelman v. Morrison, 477 U.S. 365, 385-86 (1986), (finding ineffective assistance where

counsel failed to conduct any discovery due to unreasonable, mistaken belief government

was required to turn over all inculpatory evidence without request from defense); Loyd v.

Whitley, 977 F.2d 149, 158 (5th Cir. 1992) (finding counsel's failure to obtain independent

1   psychological analysis deficient where counsel "wrongly assumed" funds not available).

2       Here, by contrast, in light of the investigative efforts Young undertook, the state court

3   was not unreasonable in finding Young reasonably relied on official police records.

4   Moreover, there is no evidence that Young's incorrect belief as to the identity of the "gone

5   on arrival caller" would have been contradicted by additional investigation.  There is no

6   evidence or even suggestion that Officer Fowlie would have agreed to an interview by the

7   defense and no other source of the correct information has been identified.

8       Nor was the state court unreasonable in finding Young acted within the bounds of

9   reasonable professional judgment when she waited to confront Officer Fowlie with the call

10  in the presence of the jury.  In the absence of any evidence, let alone substantial evidence,

11  casting doubt on the accuracy of the official information she had been provided, Young's

12  tactical decision as to how to use that information to the defendant's best advantage cannot

13  be deemed deficient. See Massaro v. United States, 538 U.S. 500, 505 (2003) (holding

14  defendant alleging ineffective assistance of counsel has burden to show "counsel's actions

15  were not supported by a reasonable strategy").

16      Accordingly, to the extent Truong's ineffective assistance claim is based on Young's

17  investigation of the "gone on arrival" evidence, Truong fails to show he is entitled to relief.

18              **2.  Decision Not to Pursue Manslaughter Defense**

19      As noted, Truong claims his counsel was ineffective in not presenting a

20  manslaughter defense.  The alternative to relying on the "gone on arrival" call to prove

21  misidentification, in Young's view, would have been to "defend against the state's case by

22  showing there was a bar fight in which [ ] Truong may have been involved, but in which he

23  did not fire a gun and was guilty of nothing more than manslaughter."  (See Pet. Ex. G ¶

24  5.)[6]  The state court denied relief on this claim, holding counsel's choice of an innocence

25

26          [6] Truong's theory in support of manslaughter liability is based on an argument that
    California law allows an aider and abettor to be convicted of charges of a lesser nature than
27  those on which the principal perpetrator is convicted.  (See Pet. at 24 (citing People v.
    Woods, 8 Cal. App. 4th 1570, 1585-86 (1992) (holding "an aider and abetter may be found
28  guilty of a lesser crime or lesser degree of crime than the ultimate offense the perpetrator is
    found to have committed"); People v. Blackwood, 35 Cal. App. 2d 728, 732 (1939) (holding,

1   defense was reasonable, whether with or "without the evidence that the [gone on arrival]

2   call was made by Officer Fowlie or Cheung."  (See In re Truong, 5378 at 6.)

3       Young asserts that her assumption about the "gone on arrival" call "informed all

4   areas of trial preparation, including investigation, decisions over which witnesses to call,

5   and opening statements."  (See Pet. Ex. G ¶ 6.)  As discussed above, Young was not

6   ineffective in relying on the official documentation of the "gone on arrival" call.  Under such

7   circumstances, absent a showing of some other alleged error, Young's tactical decision

8   cannot be deemed deficient performance.

9       The record reflects that Young conducted a sufficient investigation to make an

10  informed choice to forego a manslaughter defense.  See Strickland, 466 U.S. at 691

11  (holding "counsel has a duty to make reasonable investigations or to make a reasonable

12  decision that makes particular investigations unnecessary"); see also id. at 689-90 (noting

13  "there are countless ways to provide effective assistance in any given case").

14      First, the evidence supporting the manslaughter defense would have included the

15  testimony of Truong's friend, and purported eyewitness to the shooting, Safia Bubaker

16  ("Bubaker"), which evidence presented its own strategic risks.  Bubaker was interviewed by

17  Young prior to trial, but was not asked to testify.[7]   Truong's argument that Bubaker should

18  have been called appears to rest solely on his assertion that Young was ineffective in

19  relying on the dispatch tape.  (See Pet. at 25:4-6, 26-28) ("[I]n light of the real facts, she

20  had no legitimate tactical reason for failing to present testimony from Safia Bubaker[.]")  For

21  the reasons discussed above, such argument fails.  To the extent Truong is arguing

22  Young's decision not to call Bubaker was deficient even if Young's reliance on the tape was

23  reasonable, such argument likewise is unavailing.

24  _____

25  where manslaughter was reasonably foreseeable consequence of assault, co-defendant
    who participated could be convicted of manslaughter as aider and abettor of principal
26  convicted of murder).

27      [7]In support of this claim, Truong has submitted a transcript and video recording of an
    interview with Bubaker from November 2005, taken while Bubaker was in custody on an
28  unrelated matter.  (See Pet. Ex. H.)  Young's declaration confirms that prior to Truong's trial
    she and Bubaker discussed the details provided in the interview.  (See Pet. Ex. G ¶ 11.)

Although Bubaker would have testified she was holding Truong's shoulder to get his attention when she heard shots fired and did not feel any recoil through Truong's body, Bubaker also would have testified that the alleged fight was provoked by the female bartender and began with no more than a push by Ho,[8] that Truong and several of his friends were involved, and that even though everyone was "just . . . talking," one of Truong's friends told Truong he was going to his car to get a gun.  (See Pet. Ex. H at 65-66.)

It was reasonable for Young to make a strategic decision not to introduce such potentially double-edged evidence.  In particular, Bubaker's testimony would have confirmed that the victims were outnumbered by Truong and his friends, that the disagreement was over a minor matter, and that Truong's group brought a deadly weapon into the encounter.  Under such circumstances, a jury may have found Truong, even if not the shooter, guilty of a crime greater than manslaughter.  See Woods, 8 Cal. App. 4th at 1584  ("[T]he aider and abettor is guilty not only of the criminal act originally contemplated and abetted but also of any other crime by the perpetrator which is a reasonably foreseeable consequence of the offense originally contemplated by the aider and abettor.")  Moreover, although the two defenses technically were not mutually exclusive, evidence of Truong's involvement in the fight likely would have undermined his innocence defense.

When faced with a choice as to whether to use evidence that could be helpful but also could be counterproductive, counsel's determination to omit that evidence is a tactical decision entitled to deference.  See e.g., Burger v. Kemp, 483 U.S. 776, 795 (1987) (finding counsel was reasonable in declining to call mitigation witnesses at penalty phase of murder

_____

[8]Bubaker described the provocation by the bartender as follows:
[The bartender] kept saying, like . . . they keep bothering me, it's okay, just forget it. You know, she kept – she kept saying that they're bothering her, but don't trip over it, you know, don't – don't say any – you know, don't – it's okay, I got it, but she'd keep complaining to him.  And [Truong] was all like tell them . . . to shut the F up, you know, or something.  Tell them to leave you alone.  She said, oh, I can't that's my job.  I have to work and this and that.  And . . . it seems like she was saying that, it's her job, she had to do it, there's no other way for her to get rid of these guys, they're customers.  So it – it was like giving him – telling him to take care of it for her. (See Pet. Ex. H at 60.)

1   case, where witnesses, on cross-examination, also may have provided damaging testimony

2   regarding defendant's criminal history); Brodit v. Cambra, 350 F.3d 985, 994 (9th Cir. 2003)

3   (finding counsel was reasonable in not producing evidence that defendant did not fit

4   psychological profile of child molester, due to concern such evidence would "open the door"

5   to damaging rebuttal character evidence regarding defendant's sexual conduct and interest

6   in children).

7        Further, even assuming, arguendo, Young was deficient in not learning the source of

8   the call before trial, the state court was not unreasonable in finding her decision to forego a

9   manslaughter defense was neither ineffective assistance nor prejudicial.  In particular, as

10  the state court found, a decision to present an innocence defense was reasonable even

11  absent evidence of the call.

12       Although Young states she would not have decided to forego a manslaughter

13  defense had she known Officer Fowlie had not made the "gone on arrival" call (see Pet. Ex.

14  H ¶ 10), the appropriate inquiry turns on whether, as an objective matter, a decision to

15  proceed solely with an innocence defense was within the parameters of reasonable

16  professional conduct.  See  Harrington, 131 S. Ct. at 790.  "After an adverse verdict at trial

17  even the most experienced counsel may find it difficult to resist asking whether a different

18  strategy might have been better, and, in the course of that reflection, to magnify their own

19  responsibility for an unfavorable outcome[;] Strickland, however, calls for an inquiry into the

20  objective reasonableness of counsel's performance, not counsel's subjective state of mind."

21  Id.

22       Here, as noted and contrary to Truong's argument, the manslaughter defense was

23  neither overwhelmingly strong nor without risk.   As further noted, the manslaughter

24  evidence was, as a practical matter, inconsistent with an innocence defense.  Although the

25  jury ultimately found Truong was the shooter, the state's evidence on the issue of

26  identification was, as discussed below, reasonably subject to challenge, with or without the

27  "gone on arrival" evidence.

28       In particular, in addition to the call, Young knew before trial that a blood test showed

12

1    Ho, the prosecution's chief eye-witness, was intoxicated at the time of the shooting, and

2    that the government's only other eyewitness, Tran, had recanted her identification of

3    Truong as the shooter.[9]  Further, Young knew no gun had been found on Truong,[10] and that

4    although Officer Cheung purported to have seen a gun in Truong's hand, he had not

5    followed police procedure regarding the handling of armed suspects, thus allowing Young

6    to effectively cross-examine Officer Cheung, who conceded he took none of the required

7    procedural precautions consistent with his purported observation.  (See RT 1117-21.)

8           Young also had information that allowed her to vigorously cross-examine the state's

9    witnesses as to the physical evidence, again extracting useful concessions.  With

10   criminalist Steven Dowell ("Dowell"), for example, Young highlighted the fact that the

11   presence of gunshot residue on Truong's hands meant it was equally possible he was

12   merely in the vicinity of someone else who fired a gun, and confirmed that, other than the

13   decedent Lam, only Truong was tested for residue.  (See RT 1247-48, 1509.)  Additionally,

14   Dowell conceded it would have been possible for an officer who picked up the gun to

15   transfer particles of gunshot residue by touching Truong.  (See RT 1235.)  Further, Medical

16   Examiner Glenn Nazareno conceded the autopsy results were not conclusive as to where

17   the shooter was standing at the time the shots were fired.  (See RT 1387-88.)

18           On the record presented here, Truong fails to show the state court's determination

19   as to either the question of ineffective assistance or prejudice was unreasonable.

20           Accordingly, to the extent Truong's ineffective assistance claim is based on trial

21   counsel's failure to present a manslaughter defense, Truong has failed to show he is

22   entitled to relief.

23                          **3. Expert Testimony**

24           Truong argues defense counsel was ineffective because she did not present expert

25

26           [9] At trial, Tran, consistent with her testimony at the preliminary hearing, denied
     seeing the shooting, insisting she was drunk and vomiting in the bathroom at the time.
27   (See RT 1655-56.)

28           [10] Officer Fowlie found the gun on a barstool.

1  testimony to contradict the state's interpretation of the physical evidence.  In support

2  thereof, Truong offers a declaration from a retained forensic criminologist, Kenneth Moses

3  ("Moses").  (See Pet. Ex. J.)  In Moses's opinion, "the evidence more clearly supports a

4  finding that the victim was upright or leaning toward the shooter when the shots were fired."

5  (See Pet. Ex. J ¶ 10.)

6      Truong is not entitled to relief on this ground because he fails to demonstrate

7  Young's decision not to present expert testimony constituted deficient performance, and, as

8  the state court found, Truong fails to show he suffered any prejudice.

9      The record reveals that Young contemplated calling an expert witness to rebut the

10  state's assertion that Lam was shot while on the ground.  (See RT 1395 ("I may be calling a

11  witness regarding [Dr. Nazareno's] answers about the possibility of a shooter standing over

12  delivering these shots. . . . I don't have a medical doctor right now.").)   Although Young

13  ultimately decided to rely upon cross-examination to challenge the state's physical

14  evidence, such decision does not establish deficient performance.  See Harrington, 131 S.

15  Ct. at 789 ("Strickland does not enact Newton's third law for the presentation of evidence,

16  requiring every prosecution expert an equal and opposite expert from the defense.");

17  Reinert v. Larkins, 379 F.3d 76, 95 (3d Cir. 2004) (holding counsel, in addressing state's

18  medical evidence, "need not introduce expert testimony on his client's behalf if he is able

19  effectively to cross-examine prosecution witnesses and elicit helpful testimony").

20      In particular, neither of the two potential defenses was dependent on the position of

21  the victim at the time of the shooting, as, in both instances, the shooter assertedly was

22  someone other than Truong.  Moreover, any emphasis on the shooter's stance, such as by

23  the calling of a defense expert, had the very real potential of undercutting Truong's

24  argument that he was not the shooter.  See Harrington, 131 S. Ct. at 791 ("When defense

25  counsel does not have a solid case, the best strategy can be to say that there is too much

26  doubt about the State's theory for a jury to convict." )

27      Even assuming, arguendo, an expert should have been used, Truong fails to show

28  he was prejudiced by the omission of such testimony.  As discussed, Young conducted an

14

1   effective cross-examination of the state's expert, and, as the state court found, Truong

2   failed to "offer anything but speculation as to whether a jury would have believed the

3   testimony of his forensics expert over the state's expert . . . ." (See Pet. Ex. B at 6.)

4   Further, the prosecution's evidence as to the relative positions of the victim and the shooter

5   was not limited to expert reconstruction, but, rather, was based primarily on eyewitness

6   testimony.  Under such circumstances, it cannot be said the state court was unreasonable

7   in finding Truong failed to show a reasonable probability that, but for counsel's asserted

8   error, the result of the trial would have been different.   See Strickland, 466 U.S. at 694.

9          Accordingly, to the extent Truong's ineffective assistance claim is based on trial

10   counsel's failure to present the above-referenced expert testimony, Truong fails to show he

11   is entitled to relief.

12                    **4.  Failure to Interview Eyewitness**

13         Truong argues Young's failure to interview prior to trial and call at trial an

14   eyewitness, Tia Marie Bradford ("Bradford"),[11] constituted ineffective assistance.  Bradford

15   was the owner of the bar at the time of the shooting and was listed as a witness in a police

16   report in Young's possession.  (See Pet. Ex. I; Joint Stip., filed June 29, 2010, Ex. 3.)

17   Bradford states she was present at the time the shooting occurred and would have testified

18   to the following: she was behind the bar when the fight broke out; the fight took place near

19   the restrooms, to the left of where she stood; and she heard the gunshots come from either

20   in front of her, or to the right, near the bar entrance. (See Pet. Ex. I ¶¶ 3-6.)  Truong argues

21   such evidence, when coupled with Bubaker's testimony that he was involved in the fight,

22   would have shown he was not the shooter.

23         This claim was not raised in Truong's initial state habeas petition, filed in the

24   Superior Court; it was, however, included in his subsequent state petitions, filed in the state

25   Court of Appeal and Supreme Court, which petitions, as noted, were summarily denied.

26   Consequently, the Court "must determine what arguments or theories . . . could have

27   ────────────────────

28         [11] At the time of the shooting, Bradford used the name Soyon Bradford.  (See Pet. Ex. I ¶ 1.)

15

1   supported [ ] the state court's decision," and "ask whether it is possible fair minded jurists

2   could disagree that those arguments or theories are inconsistent with the holding in a prior

3   decision of [the Supreme] Court,"  Id. at 786.

4        Here, assuming Young was deficient in failing to seek an interview with Bradford,

5   the California Supreme Court reasonably could have determined Truong nevertheless

6   failed to show the absence of such witness's testimony prejudiced the outcome of his trial.

7   In particular, Truong fails to show Bradford's testimony should have been presented, let

8   alone that it would have altered the outcome of the trial.

9        As noted, it was reasonable for Young to make a tactical decision to proceed solely

10  on an innocence defense, and in connection with such decision, to determine not to call

11  Bubaker, who would have put Truong in the middle of the fight at the time of the shooting.

12  Bradford's testimony was useful only to the extent Young wished to place Truong in the

13  middle of the fight, i.e., away from where Bradford states she heard the shots ring out.

14        Further, placing the shooter and Truong at opposite ends of the bar would have

15  posed a problem with regard to defense counsel's explanation for the gunshot residue on

16  Truong's hands, which explanation was dependent in part on Truong's proximity to the

17  shooter.  Moreover, the jury may well have found Bradford's auditory perception was

18  unreliable, particularly given the surrounding circumstances, which included a busy bar

19  scene and a physical altercation.  Testimony by Bradford that she heard shots being fired

20  away from the fight, but did not see a shooter, was not likely to have carried more weight

21  than the eyewitness and expert testimony, and had the potential of reflecting unfavorably

22  on the credibility of the defense presentation.

23        Under such circumstances, it cannot be said that counsel's failure to interview

24  Bradford caused a "breakdown in the adversary process that renders the result unreliable."

25  See Strickland, 466 U.S. at 687.

26        Accordingly, to the extent Truong's ineffective assistance claim is based on trial

27  counsel's failure to interview Bradford and present her testimony at trial, Truong fails to

28  show he is entitled to relief.

1

**B.   Suppression of Exculpatory Evidence**[12]

2      In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held "the suppression

3   by the prosecution of evidence favorable to an accused upon request violates due process

4   where the evidence is material either to guilt or to punishment, irrespective of the good faith

5   or bad faith of the prosecution.[13]  Id. at 87.   The Supreme Court later held the duty to

6   disclose such evidence applies even when there has been no request by the accused. See

7   United States v. Agurs, 427 U.S. 97, 107 (1976).

8      To prevail on a Brady claim, a moving party must show that "(1) the evidence was

9   exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the

10   suppressed evidence was material to his guilt or punishment." See United States v.

11   Antonakeas, 255 F.3d 714, 725 (9th Cir. 2001).  A prosecutor has a duty to disclose

12   material, favorable evidence known to others acting on the government's behalf in the case.

13    Kyles v. Whitley, 514 U.S. 419, 437 (1995).  Evidence is material under Brady only "if there

14   is a reasonable probability that, had the evidence been disclosed to the defense, the result

15   of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682

16   (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the

17   outcome."  Id.

18      Truong claims the prosecutor's Brady obligations extended beyond disclosure of the

19   "gone on arrival" call itself.  In particular, Truong contends the prosecutor was required to

20   notify him that Officer Fowlie was not the caller, and to provide him with the identity of the

21   actual caller.  The state court denied the claim, holding evidence that an officer other than

22   Officer Fowlie made the call was not exculpatory.  See Truong, A103762, 2005 WL 11776

23   at *5.   In so holding, the state court noted it was not the responsibility of the prosecutor to

24   "guess at possible erroneous conclusions the defense would jump to about that evidence"

25   or to "anticipate how Brady material might be misinterpreted."  Id. at *6.  The state court

26

27      [12] The last reasoned decision to address Truong's Brady claim is the California Court
   of Appeal's decision affirming Truong's conviction.  (See Pet. Ex. L at *4.)

28      [13] There is no allegation here of bad-faith on the part of the prosecutor.

17

1   further found it "pure supposition" that the presence of the true caller would have provided

2   any credible basis to persuade the jury of Truong's innocence.  Id.  In the instant petition,

3   Truong asserts the state court unreasonably applied Brady's disclosure and materiality

4   requirements.

5                               **1.  Evidence Subject to Disclosure**

6          Brady disclosure obligations apply only to evidence that either conflicts with the

7   prosecution's theory, supports the defense theory, or can be used to impeach a

8   government witness.  See Agurs, 427 U.S. at 103-07 (holding Brady rule applies to failures

9   to disclose evidence that undermines prosecution's case or supports claim of innocence);

10  Bagley, 473 U.S. at 676 (holding impeachment evidence falls within Brady rule).  The

11  obligations do not extend to cover all information that could help counsel in trial

12  preparation.  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (holding Brady does

13  not apply to evidence that is not favorable to the accused, even though evidence would be

14  useful to defense in preparing for trial).

15         Here, the "gone on arrival" call constituted Brady material as it had the potential to

16  support the defense theory that the real shooter had fled the scene prior to the arrival of

17  police, and to contradict the officers' testimony that Truong's conduct upon their arrival was

18  consistent with his being the shooter.  By contrast, evidence that Officer Fowlie was not the

19  officer who made the call did not have the potential to establish either of those theories.  On

20  the contrary, the state's case was bolstered by the evidence that another officer had made

21  the call, an officer who could not have done so based on firsthand knowledge, given that

22  Officers Fowlie and Cheung were the first officers on the scene and the only officers

23  present when Truong was apprehended. Nor did such evidence constitute impeachment

24  evidence as to Officer Fowlie, as there was no prior inconsistent statement; Officer Fowlie

25  never claimed he had made the call or that he believed the true suspect to have fled.

26         Citing Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002), Truong argues his counsel

27  was affirmatively misled by an incomplete form of disclosure.  Truong's reliance on Benn is

28  unavailing.  In Benn, the prosecutor was in possession of expert reports, both of which

                                                   18

concluded the fire there at issue was accidental rather than arson, evidence that clearly was favorable to the defense; rather than turning the reports over to defense counsel, the prosecutor deceptively produced only summaries that omitted the exculpatory conclusion and instead tended to point toward Benn's culpability. Id. at 1060, 1062 (holding prosecutor's failure to disclose full extent of expert conclusions constituted Brady violation).

Here, by contrast, the prosecutor did not produce a summary that skewed the facts to indicate guilt; he produced the actual dispatch tape and log. There were no affirmative representations by the police or the prosecutor that Officer Fowlie made the call. To the extent Young's interpretation of the evidence she received proved to be incorrect, any such "disadvantage was no more than exists in any case where the State presents [ ] damaging evidence that was not anticipated." See Weatherford, 429 U.S. at 561 (holding prosecution had no duty to disclose intent to call undercover agent as witness, even though agent, who concealed his true identity until trial, had told petitioner he would not be a witness for the prosecution; see also id. at 559-60 (rejecting argument that prosecution's failure to disclose agent as witness unfairly affected defendant's trial preparation and "lulled defendant into a false sense of security").

Lastly, Truong argues the prosecution had the obligation to provide him with the name of the actual caller. The prosecutor, however, did not have that information, nor can such knowledge be imputed to him. Although, as noted, the prosecutor has a duty to disclose material evidence favorable to the defense and known to "others acting on the [state's] behalf," see Kyles, 514 U.S. at 437, Truong fails to show anyone acting on the state's behalf possessed such information. Cf. Kyles, 514 U.S. at 438 (imputing to prosecutor information known to "police investigators"); United States v. Price, 566 F.3d 900, 909-10 (9th Cir. 2009) (finding Brady violation based on prosecutor's failure to discover and disclose impeachment evidence as to key government witness, where prosecutor conceded "lead investigative agent" in charge of case "very well 'may have' had

1    all of the information . . . in his possession").[14]

2         Indeed, at a hearing on Young's motion for discovery sanctions, the prosecutor

3    stated it was "extremely hard to tell" from the tape who made the "gone on arrival" call and

4    that he "was not able to determine who it was."  (See RT 1611.)  Officer Fowlie also

5    testified that he could not identify the voice of the caller, even by reference to a log that

6    listed officers on the scene.  (See RT 1190-91.)  The trial took place in September 2002,

7    over three years after the date of the shooting, numerous uniformed officers responded to

8    the report of the shooting, and there is no allegation that any type of record existed that

9    could have identified the caller beyond the dispatch tape and log.  See Moore v. Illinois,

10   408 U.S. 786, 795 (1972) (holding there is "no constitutional requirement that the

11   prosecution make a complete and detailed accounting to the defense of all police

12   investigatory work on a case").

13        Accordingly, Truong fails to show the prosecutor violated his duty to disclose.

14              **2.  Materiality of Evidence of Caller's Identity/Prejudice**

15        Irrespective of whether evidence of the "gone on arrival" caller's identity was subject

16   to disclosure under Brady, Truong's claim fails, for the reason that he fails to show such

17   evidence was material.  As the Court of Appeal noted, "[i]t is pure supposition on [Truong's]

18   part that an officer arriving after [Officers] Cheung and Fowlie would have had any credible

19   basis for believing the shooter had left the scene." (See Pet. Ex. L at *6);  Wood v.

20   Bartholomew, 516 U.S. 1, 6-8 (1995) (holding "reasonable probability" of different outcome

21   may not be based on mere "speculation with slight support"); Downs v. Hoyt, 232 F.3d

22   1030, 1037 (9th Cir. 2000) (holding petitioner failed to show prejudice where petitioner's

23   argument "amount[ed] to speculation that the withheld material *might* have led to some

24   admissible evidence which *might* have been sufficiently favorable to meet the Bagley

25

26

27        [14] Although, arguably, the officer who made the call was aware of his own identity as
     the caller, at least for some period of time after the call was made, the Court is aware of no
28   authority, let alone Supreme Court authority, imputing to the prosecution knowledge from
     police personnel who are not part of the investigative team.

standard") (emphasis in original).  Rather, as the Court of Appeal further noted, it is far more likely such later-arriving officer misunderstood the situation.  Under such circumstances, the state court was not unreasonable in concluding Truong failed to demonstrate a reasonable probability that, had the evidence been disclosed to the defense, such evidence would "have had a material impact on the jury's verdict."  See id.

Accordingly, Truong fails to show he is entitled to relief based on his claim of suppression of exculpatory evidence.

### C.   Prosecutorial Misconduct[15]

Truong claims three remarks made by the prosecutor during closing argument constituted impermissible victim impact statements and, as such, violated his constitutional rights.

### 1.  Standard of Review

In Darden v. Wainwright, 477 U.S. 168 (1986), the Supreme Court set forth a two-pronged approach for reviewing commentary by the prosecutor; the first question is whether the prosecutor's remarks were improper, and, if so, the second question is whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  See id. at 181 (internal quotation and citation omitted). Further, "[t]he appropriate standard of review for such a claim is "the narrow one of due process, and not the broad exercise of supervisory power." Id. (internal quotation and citation omitted).  "That standard allows a federal court to grant relief when the state-court trial was fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of constitutional magnitude."  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000).

---

[15] The Superior Court deemed this claim defaulted due to Truong's failure to raise it on direct appeal.  (See Pet. Ex. B at 7.)  Truong argues the claim is not defaulted, and respondent, without addressing such assertion, has replied to the claim on its merits, thereby waiving any procedural bar that may have existed.  See Franklin v. Johnson, 290 F.3d 1223, 1232-33 (9th Cir. 2002). Without a decision on the merits, this Court reviews the claim de novo.  See Lewis v. Mayle, 391 F.3d 989. 996 (9th Cir. 2004) (holding "[d]e novo review, rather than AEDPA's deferential standard, is applicable to a claim that the state court did not reach on the merits").

### 2.  The Prosecutor's Remarks

In closing argument, the prosecutor stated he could not call the decedent's family to the stand "to say how their brother, how their son, lived his life" (see RT 2046); he asked the jury not to "forget about Lung Lam[,] that he is the victim in this case" (see id.); and he asked the jury to convict Truong for murder to "[d]o justice in this case, justice for the Lam family" (see RT 2047).

Although prosecutors are allowed "reasonably wide latitude" in fashioning their closing arguments, see United States v. Lester, 749 F.2d 1288, 1301 (9th Cir. 1984), prosecutors must avoid appeals to the jury that are wholly irrelevant to the issues and have the effect of "arous[ing] passion and prejudice," see Viereck v. United States, 318 U.S. 236, 247 (1943).  Here, the above-quoted remarks by the prosecutor were improper; in non-capital case, evidence of the impact of a crime on the victim or victim's family is inadmissable unless relevant to the guilt of the accused.  See, e.g., United States v. Copple, 24 F.3d 535, 545–46 (3d Cir. 1994), (holding, in prosecution for mail fraud, trial court did not err in admitting evidence that victims in fact suffered losses, but did err in admitting testimony about the *"impact* of the losses" on victims' lives) (emphasis in original), cert. denied, 513 U.S. 989 (1994) . In the instant case, no evidence of impact was offered or admitted and respondent does not argue the comments were relevant to the issues; rather, respondent points to a lack of prejudice resulting therefrom.  The Court next turns to the question of prejudice.

### 3.  Prejudice

In Drayden, the prosecutor, in closing argument, took the witness stand, assumed the role of the deceased victim, and delivered a lengthy "soliloquy".  See Drayden, 232 F.3d at 711-13.  The Ninth Circuit, while strongly disapproving such "deplorable" conduct, nonetheless denied habeas relief, finding the petitioner therein failed to demonstrate the prosecutor's tactic "so infected the trial with unfairness that [the petitioner] suffered a violation of his due process rights." See id. at 713 (internal quotation and citation omitted);

1   see also Allen v. Woodford, 395 F.3d 979, 1016 (9th Cir. 2004) (holding prosecutor's

2   comparison of defendant to Hitler improper but not sufficient to show prejudice; noting

3   reference was "pure argument" and trial court admonished jury not to consider statements

4   from counsel as evidence); Rodriguez v. Peters, 63 F.3d 546, 565 (7th Cir. 1995) (holding

5   closing argument that improperly appealed to sympathy for deceased victim and included

6   assertion that victim's mother's "life is over" not prejudicial where improper remarks

7   constituted small part of total argument and there was "substantial evidence" of defendant's

8   guilt).

9        Here, the victim impact statements constituted just three lines out of a total of thirty-

10   seven transcript pages for the prosecutor's closing argument, and did not embellish with

11   any detail the impact on either Lam or his family.  (See RT 1965-72 (closing), 1974-91

12   (summation).)   Moreover, the trial judge explicitly instructed the jury, both at the outset of

13   the trial and immediately before closing argument, that it was not to decide the case based

14   on improper sentiment and, further, that the remarks of counsel were not evidence:

15       You must not be influenced by pity for the defendant, or prejudice against him. . . .
         You must not be influenced by mere sentiment, conjecture, sympathy, passion,
16       prejudice, public opinion or public feeling.  Both the people and the defendant have a
         right to expect that you will conscientiously consider and weigh the evidence, apply
17       the law and reach a just verdict, regardless of the consequences.  The statements of
         the attorneys made during the trial are not evidence.
18
19   (See RT 1068-69; see also RT 1938-39 ).  There is "an assumption of the law " that jurors

20   follow the instructions given by the court.  See Richardson v. Marsh, 481 U.S. 200, 207-

21   208, 211 (1987) (holding "juries are presumed to follow their instructions"; recognizing

22   "narrow exception," such as instruction to ignore "facially incriminating confession").

23        Nor, contrary to Truong's argument, is any aspect of the jury's deliberations

24   indicative of prejudice.  Given the seriousness of the charge and the number of witnesses

25   who testified, the length of deliberations was not unusual.  Cf. United States v. Kojayan, 8

26   F.3d 1315, 1321, 1323 (9th Cir. 1993) (finding prejudice where prosecutor, in closing

27   argument, "made factual assertions [about matters outside the record] he well knew to be

28   untrue" and jury deliberated for more than two days after one-and-a-half-day trial, indicating

23

"a close case").   Moreover, the jury's requests for readback of various witnesses's testimony is indicative of the jury's careful consideration of the relevant evidence rather than on any plea to sympathy.

Accordingly, Truong fails to show he is entitled to relief based on his claim of prosecutorial misconduct.

### D.    Cumulative Error

In the instant petition, Truong concludes by arguing his claims justify habeas relief when viewed together, even if no discrete claim standing on its own is sufficient to show a constitutional violation.  See Chambers v. Mississippi, 410 U.S. at 298, 302-03 (1973) (recognizing prejudice resulting from cumulative error).  As discussed above, the only errors here were (1) defense counsel's failure to interview an eyewitness, whose testimony was of questionable credibility, not of great probative value, and likely to undermine Truong's innocence defense, and (2) the prosecutor's closing remarks appealing to sympathy, which represented a small part of the prosecutor's argument and the juror's were instructed not to consider.  Truong has failed to show these errors worked in combination to deny him a fair trial.

First, the errors, as discussed above, were not of great significance. Second, the errors were in no manner related, and thus lacked any greater impact when considered in combination.  Third, the evidence against Truong was strong.  Cf. Thomas v. Hubbard, 273 F.3d 1164, 1168, 1179-80 (9th Cir. 2001) overruled on other grounds by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002) (holding cumulative effect of multiple "significant trial errors" constituted denial of due process where, in murder case based primarily on "uncorroborated testimony of a person who himself had both a motive and an opportunity to commit the crime," errors consisted of improper introduction of "triple hearsay"; prosecutorial misconduct in eliciting evidence about defendant's prior use of firearms; and improper truncation of cross-examination of lead investigator regarding conduct of purported eyewitness, who, according to defense theory, was actual killer).

Accordingly, Truong has failed to show he is entitled to relief based on his claim of

1  cumulative error.

2        **E.  Certificate of Appealability**

3        A certificate of appealability will be denied with respect to petitioner's claims.  <u>See</u> 28

4  U.S.C. § 2253(c)(1)(a); Rules Governing Habeas Corpus Cases Under § 2254, Rule 11

5  (requiring district court to issue or deny certificate of appealability when entering final order

6  adverse to petitioner).  Specifically, petitioner has neither made "a substantial showing of

7  the denial of a constitutional right," <u>Hayward v. Marshall</u>, 603 F.3d 546, 554-55 (9th Cir.

8  2010) (en banc) (citing 28 U.S.C. § 2253(c)(2)), nor demonstrated his claims are "debatable

9  among reasonable jurists."  <u>Id.</u> at 555.

10                              **CONCLUSION**

11        For the reasons set forth above:

12        1.  The petition for a writ of habeas corpus is hereby DENIED.

13        2.  A certificate of appealability is hereby DENIED.

14        3.  The Clerk shall enter judgment in favor of respondent and close the file.

15        **IT IS SO ORDERED.**

16

17  Dated: December 27, 2011

18                                    _____
                                      MAXINE M. CHESNEY
19                                    United States District Judge

20

21

22

23

24

25

26

27

28